# Exhibit A

IO/29/2007    09:13  One Legal, Inc.                    (FAX)415 437 9684              P.004/028

TERRY M. GORDON - SBN 75604
LAW OFFICES OF TERRY M. GORDON
Three Harbor Drive, Suite 215
Sausalito, California 94965
Telephone:    (415) 331-3601
Facsimile:    (415) 331-1225

JOHN G. JACOBS (pending PRO HAC VICE)
BRYAN G. KOLTON (pending PRO HAC VICE)
THE JACOBS LAW FIRM, CHTD.
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
Telephone: (312) 427-4000
Facsimile: (312) 427-1850

JAY EDELSON (pending PRO HAC VICE)
MYLES MCGUIRE (pending PRO HAC VICE)
KAMBEREDELSON, LLC
53 West Jackson Boulevard, Suite 1530
Chicago, Illinois 60604
Telephone: (312) 589-6370
Facsimile: (312) 873-4610

ATTORNEYS FOR PLAINTIFF

ENDORSED
FILED
San Francisco County Superior Court

OCT 1 8 2007

GORDON PARK-LI, Clerk
BY: CRISTINA E. BAUTISTA
Deputy Clerk

CASE MANAGEMENT CONFERENCE SET

MAR 2 1 2008 - 9ᵃᵐ AM

DEPARTMENT 212

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN FRANCISCO

ALIZA VALDEZ, individually and on behalf
of a class of similarly situated individuals,

                    Plaintiff,

v.

M-QUBE, INC., a Delaware corporation,
VERISIGN, INC., a Delaware corporation,
and BUONGIORNO USA, INC., a Florida
Corporation, d/b/a BLINKO,

                    Defendants.

Case No.

CGC07 - 468362

COMPLAINT FOR DAMAGES
AND INJUNCTIVE RELIEF
[RESTITUTION/UNJUST
ENRICHMENT; TORTIOUS
INTERFERENCE WITH A
CONTRACT; UNLAWFUL,
UNFAIR AND DECEPTIVE
BUSINESS PRACTICES (CAL.
BUS. & PROF. CODE §17200, *et
seq.*)]

DEMAND FOR JURY TRIAL
CLASS ACTION

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

BY FAX

1

<u>**CLASS ACTION COMPLAINT**</u>

2     Plaintiff Aliza Valdez ("Valdez") on behalf of herself and a class, brings this class

3  action against m-Qube, Inc. ("m-Qube"), VeriSign, Inc. ("VeriSign") and Buongiorno USA,

4  Inc. ("Blinko") seeking to stop Defendants' practice of causing cellular telephone customers

5  to be billed for mobile content services ordered not by them, but rather by the customer

6  previously assigned their telephone number, and to obtain redress for all persons injured by

7  their conduct.  Plaintiff alleges as follows upon personal knowledge as to herself and her own

8  acts and experiences, and, as to all other matters, upon information and belief, including

9  investigation conducted by her attorneys.

10                              **NATURE OF THE CASE**

11     1.     The increased use of cell phones has given rise to a new industry that provides

12  so-called "mobile content" services such as ringtones, text alerts, jokes, news, games, and

13  daily horoscopes to cell phone users' mobile devices.  The providers of mobile content (the

14  mobile "content providers") charge for their services and cause such charges to be placed

15  directly on customers' cell phone accounts through their wireless carriers (the "carriers").

16  The carriers then bill and collect such amounts, serving as partners in these transactions,

17  retaining a portion of all revenue that they collect on account of mobile content services.

18     2.     Because mobile content providers, such as Blinko, are typically unable to

19  establish a direct billing and content delivery relationship with the carriers, they most often

20  turn to one of a handful of companies known in the industry as "aggregators," such as m-

21  Qube and VeriSign, that act as billing intermediaries without whom the mobile content

22  providers would generally be unable to provide and bill for their mobile content services.

23     3.     While aggregators such as VeriSign and m-Qube charge their content provider

24  clients some upfront fees, their revenue is primarily generated through a "revenue share" on

25  transactions for which they bill the carriers' customers: each time a charge is incurred in

26  connection with an alleged purchase of mobile content services offered by a content provider,

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
2

1  the aggregator and the content provider cause the charge to be billed directly on the cellular

2  telephone bill of the carrier's customer who currently owns and/or uses the telephone

3  number claimed to be associated with that purchase.

4      4.    The carrier then bills and collects the charges from its current customer,

5  retains a substantial portion of the proceeds as its "revenue share" and then remits the

6  balance to the aggregator, i.e., m-Qube or VeriSign, who retains a percentage of the balance

7  in the form of its own "revenue share" and who then, in turn, remits the balance to its content

8  provider client, e.g., Blinko.

9      5.    In a widespread industry practice little known by those outside the industry,

10  but known to Defendants, carriers such as AT&T Mobility, LLC d/b/a Cingular Wireless

11  ("Cingular"), Cellco Partnership d/b/a Verizon Wireless ("Verizon"), Sprint-Nextel

12  Corporation ("Sprint") and T-Mobile USA, Inc. ("T-Mobile"), among many others, routinely

13  "recycle" so-called "dirty" telephone numbers to their customers when they sign up for new

14  cellular telephone service. The numbers are "recycled" in that they were previously assigned

15  to other persons or entities. The numbers are "dirty" in that they are encumbered with pre-

16  existing billing obligations for products and services authorized to be purchased by the

17  carriers' subscribers previously assigned those numbers.

18      6.    Despite their knowledge about the problem of recycled dirty numbers,

19  Defendants have helped create and maintain a system through which cell phone users are

20  billed for mobile content services ordered not by them, but by the previous subscribers

21  assigned their cell phone numbers.

22      7.    As a result, for years Defendants have systematically, repeatedly and without

23  authorization caused charges to be placed on the cell phone bills of thousands of consumers

24  across the country for content that was never authorized to be purchased by the current

25  subscribers of the affected phone numbers, but rather by the previous subscribers assigned

26  such cell phone numbers, and they have profited enormously from their wrongful conduct, in

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

3

1    violation of: (a) the common law of unjust enrichment; (b) the common law of tortious

2    interference with a contract; and (c) in violation of California Business and Professions Code

3    section 17200 consumer fraud provisions.

4        8.    Plaintiff seeks on behalf of herself and the class members, money damages,

5    disgorgement, injunctive and declaratory relief, costs, and reasonable attorney's fees.

6                                    **PARTIES**

7        9.    Plaintiff Aliza Valdez is a citizen of California.

8        10.   Defendant m-Qube, Inc., is an "aggregator" that operates a mobile transaction

9    network that processes mobile payments on its behalf and on behalf of carriers and mobile

10   content providers. m-Qube is a Delaware corporation with its headquarters and principal

11   place of business in Mountain View, California. m-Qube does business throughout the

12   United States, including the State of California and this County.

13       11.   Defendant VeriSign, Inc. is an aggregator with a self-proclaimed "market-

14   leading portfolio of managed communications and content offerings" whose operations have

15   become essentially merged with those of its subsidiary m-Qube. In May 2006, VeriSign

16   acquired m-Qube and has since integrated and operated many of m-Qube's aggregator

17   systems including, but not limited to, those processing communications and/or mobile

18   content charges that are the subject of this suit. VeriSign is a Delaware corporation with its

19   headquarters and principal place of business in the State of California. VeriSign does

20   business throughout the United States, including the State of California and this County.

21       12.   Defendant Buongiorno USA, Inc. d/b/a Blinko, is a "mobile content provider"

22   and U.S. subsidiary of Italian media giant Buongiorno SpA that creates and distributes,

23   among other things, music ringtones, wallpapers, games, graphics, horoscopes, data, news,

24   and information transmitted or received via chat services (collectively, "content") to cell

25   phone devices. Blinko is a Florida corporation with its headquarters and principal place of

26

27

28
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

4

1   business in Miami Beach, Florida, with offices in Los Gatos, California.  It does business

2   throughout the United States, including the State of California and this County.

3                        **JURISDICTION**

4        13.    This Court has jurisdiction over the causes of action asserted herein pursuant

5   to the California Constitution, Article VI, §10, because this case is a cause not given by

6   statute to other trial courts.

7        14.    This Court has jurisdiction over Defendants pursuant to Code of Civil

8   Procedure section § 410.10 because Defendants reside in and/or conduct business in the State

9   of California and/or many of Defendants' wrongful acts arose or emanated from California.

10                      **VENUE**

11       15.    Venue is proper in this Court pursuant to Code of Civil Procedure §§ 395 and

12   395.5 because at least one of the Defendants, Blinko, has not filed a statement with the

13   California Secretary of designating its principal office within the State of California.

14     **THE PROBLEM OF RECYLED DIRTY CELL PHONE NUMBERS**

15       16.    Cell phone customers are assigned unique phone numbers for their phones,

16   just like traditional land-lines phones.

17       17.    However, unlike traditional phones, people can use cell phones to pay for

18   certain third-party provided mobile content services, like, for example, "ringtones," or

19   subscriptions for horoscopes, jokes or stock quotes, sent periodically to customers' cell

20   phones.  (A ringtone is simply the sound made by a telephone to indicate an incoming call.

21   The term is most often used to refer to the customizable sounds available on mobile phones.)

22       18.    These mobile content services generally renew automatically each month and

23   the resulting charges are included on the customer's cell phone bill.

24       19.    The instant lawsuit flows from what happens when a carrier reissues (or

25   "recycles") a cellular number previously assigned to one of its customers that has been

26   abandoned.  (Customers abandon numbers for many different reasons, e.g. they move to a

27

28

1  different area code, they change carriers, they no longer want one of their cell phones, or they

2  want a different phone number.)

3       20.     Defendants know that these abandoned numbers are often encumbered with

4  preexisting subscriptions to mobile content services, thus rendering these numbers "dirty."

5       21.     Nevertheless, specifically in order to bilk cell phone customers out of money,

6  Defendants have refused to set up procedures to insure that cell phone customers are not

7  charged for preexisting subscriptions authorized by previous subscribers assigned the

8  numbers.

9       22.     Thus, when a telephone number is reassigned to a new customer, Defendants

10  continue to charge the new customer for subscriptions purchased by the old customers.

11                **THE FACTS RELATING TO THE NAMED PLAINTIFF**

12       23.     On or about July 3, 2006, Plaintiff Aliza Valdez purchased new cell phone

13  service for her personal use from an authorized Sprint sales representative.

14       24.     On that same day, in exchange for a Sprint cell phone service plan of 300

15  "anytime" minutes, Valdez agreed to pay Sprint $39.99 each month for a period of 12

16  months.

17       25.     Upon activating her cellular telephone account on or about July 10, 2006,

18  Sprint provided Valdez a cellular phone number.

19       26.     Unbeknownst to Valdez at the time, Sprint provided her with a recycled

20  "dirty" phone number – one saddled with preexisting obligations, encumbrances and billing

21  arrangements for products and services purportedly purchased by the previous cell phone

22  subscriber assigned that number.

23       27.     Thus, beginning on or about July 17, 2006 – not more than a week after

24  Valdez obtained her cell phone number and started receiving service from Sprint – and

25  continuing through September 17, 2006, Valdez's cell phone account was charged for

26

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

6

1   multiple unwanted "premium" services in the form of text message "alerts" and "ringtones"

2   from Defendants.

3        28.    At no time did Valdez authorize the purchase of these products and services

4   offered by Defendants and at no time did Valdez consent to Defendants' sending of text

5   message alerts or ringtones to her telephone number.

6        29.    Throughout the relevant time period, Defendants caused Sprint to bill Valdez

7   a monthly premium text "message" service charge in the amount of $9.99 for so-called "Text

8   Alerts" allegedly provided by Defendants.  For instance, on or about July 17, 2006

9   Defendants charged Valdez $9.99 for premium message services described as "42222 Text

10  Alerts."  Similarly, on or about, August 17, 2006 Defendants charged Valdez $9.99 for

11  premium message services described as "42222 Text Alerts."  On or about September 17,

12  2006 Defendants again charged Valdez $9.99 for premium message services described as

13  "42222 Text Alerts."

14       30.    During the relevant time period, Defendants also caused Sprint to bill Valdez

15  a premium "ringer" service charge of $3.99 on several occasions.  For instance, on August

16  12, 2006 Defendants charged Valdez $3.99 for premium ringer services described as "42222

17  Ringtone."  Similarly, on or about September 4, Defendants charged Valdez $3.99 for

18  premium ringer services described as "42222 Ringtone."

19       31.    At no time did Valdez authorize Sprint, Blinko, m-Qube or anyone else to bill

20  her for these charges.  On or about September 15, 2006, Valdez first became aware of the

21  unauthorized charges on her August bill for which Sprint was billing her.  Valdez thereafter

22  contacted Sprint to complain that she did not authorize the purchase of any product or service

23  associated with Blinko's charges and disputed that she was responsible for paying such

24  unauthorized charges.

25       32.    A Sprint representative agreed to credit Valdez for some of the unauthorized

26  charges but advised Valdez to expect to continue to be billed for similar charges each month

27

28
_____
COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
                          7

1   for the duration of her contract.  Valdez was advised by a Sprint representative that it would

2   continue to bill Valdez for such premium services until Sprint received notice from the

3   purported third-party mobile content provider (i.e., Blinko) to no longer bill for such

4   services, despite Valdez's request not to be billed for such charges.

5        33.     Sprint also informed Valdez that she must have provided her consent to

6   receive such premium text message services and to pay for them, though at no time did

7   Sprint attempt to verify Valdez's purported authorization of these charges or undertake to

8   resolve the billing dispute.  Rather, Sprint simply "passed the buck," advising Valdez to

9   contact the third-party vendor, Blinko.

10        34.     Thereafter, Valdez contacted Blinko and on or about September 15, 2006, and

11   Blinko provided Valdez with a copy of Valdez's purported authorization to purchase the

12   products or services associated with the Blinko charges being billed by Sprint

13        35.     The purported authorization to be billed for such charges was supposedly

14   obtained from an unidentified person with the same telephone number eventually assigned by

15   Sprint to Valdez; however, the authorization for the subject charges was purportedly obtained

16   on February 16, 2006 – a date more than **four months** <u>prior</u> to the time that Valdez

17   purchased her cell phone service from Sprint, obtained that same cell phone number from

18   Sprint, or started receiving Sprint service.  Valdez could not possibly have authorized the

19   charges for which she was being billed.

20

21   **DEFENDANTS HAVE CAUSED TO BE BILLED AND COLLECTED**
    **VAST SUMS IN UNAUTHORIZED MOBILE CONTENT CHARGES**

22

23        36.     In order to tap into the emerging wireless content marketplace and make

24   content services available to wireless consumers, content providers such as Blinko must first

25   obtain access to wireless carriers' mobile communications networks and they frequently do

26   so by "partnering" with aggregators such as m-Qube and VeriSign that provide the content

27   providers direct access to the carriers through existing relationships.

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

37.     m-Qube and VeriSign have developed vast distribution and billing systems that integrate into the wireless networks of some of the largest wireless carriers nationwide, including Verizon, Cingular, Sprint Nextel, T-Mobile, Alltel, and US Cellular, among others.

38.     Prior to its May 2006 purchase of m-Qube, VeriSign operated its own aggregator systems including, but not limited to, those processing communications and/or charges associated with recycled telephone numbers.  Since its May 2006 purchase of m-Qube, VeriSign has integrated and operated many of m-Qube's aggregator systems including, but not limited to, those processing communications and/or charges associated with recycled telephone numbers.

39.     While aggregators such as m-Qube and VeriSign charge their content provider clients some upfront fees, their revenue is primarily generated through a "revenue share" on transactions for which they bill the carriers' customers: each time a charge is incurred in connection with an alleged purchase of mobile content services offered by a content provider, the aggregator and the content provider cause the charge to be billed directly on the cellular telephone bill of the carrier's customer currently assigned the telephone number claimed to be associated with the purchase.

40.     The carrier then bills and collects the charges from its current customer, retains a substantial portion of the proceeds as its "revenue share" and then remits the balance to the aggregator, e.g., m-Qube or VeriSign, who retains a percentage of the balance in the form of its own "revenue share" and then remits the balance to its content provider client, e.g., Blinko.

41.     As alleged previously, Defendants know that the carriers routinely "recycle" so-called "dirty" telephone numbers to their customers when they sign up for new cellular telephone service.  Indeed, Blinko's former president, Burton Katz has publicly acknowledged the problem of recycled dirty numbers to be its "largest challenge,"

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
9

"Mystery" billing and refurbished phone numbers. This has become perhaps our largest challenge, and is something we are aggressively working to address with our carrier partners. We have found instances where customers have been charged when that customer acquired a "refurbished" mobile phone number from their carrier. A "refurbished" number is number given to a customer that was previously used by another of the carrier's subscribers. If the previous subscriber failed to cancel their Blinko subscription before giving up the number, the "refurbished" number will continue to be billed.

42.    m-Qube, VeriSign and Blinko have registered thousands of transactions and processed many thousands of dollars in transactions over the years and have profited enormously from their arrangement with their carrier partners, aggregator partners and content provider partners.

43.    The vast majority of the conduct that led to the billing and collecting of unauthorized cell phone charges either occurred in California or was directed from here. The principal offices of m-Qube and VeriSign are located in California. The act of processing unauthorized charges to consumers' cell phone bills frequently begins in California or is under the control of persons located within California. Many of the systems employed by the aggregator Defendants were distributed, developed and/or manufactured by persons located in California. Calls from subscribers nationwide to Defendants route to a California location and subscribers are directed by the carriers to correspond with a Defendant at a California location. Press releases by the aggregator Defendants frequently disseminate from California. Business decisions for each aggregator Defendant are made in California.

44.    Defendants have not only sanctioned this illegal billing, they have actively and knowingly promoted it by, *inter alia*, actively negotiating and facilitating partnerships between and amongst each other and/or other carriers, aggregators and content providers wherein (1) the content providers and aggregators do not adequately verify whether a telephone number has been recycled; (2) the carriers do not adequately verify the details of the purported authorization to place charges on a cell phone customer's bill, including the identity of the person who supposedly consented to the service, the date such consent was

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
10

1   obtained or the manner in which it was obtained; and/or (3) charges are illegally inserted into

2   customers' billing statements for subscriptions authorized by the subscriber previously

3   assigned the telephone number.

4        45.    If Defendants wanted to end this illegal billing, they could do so in an instant.

5   For instance, all they would have to do is ensure that the carriers and content providers report

6   to each other and to the aggregators (1) the identity of the person who subscribed to the

7   services in question, along with the date of that subscription, and (2) the identity of the

8   current owner of the phone number in question, along with the date he or she obtained that

9   number. If the identities do not match or the dates are inconsistent (i.e. the carrier's records

10   show that the consent date came prior to the date the current owner obtained his or her

11   number), no charges would be included on the customer's billing statement.

12        46.    Defendants have intentionally helped create and maintain a system wherein

13   each participant has a piece of the information and thus can, at least, claim (false as it is) that

14   the blame rests solely at the feet of another.  Such system constitutes a deliberate and willful

15   scheme to cheat large numbers of people out of small amounts of money.

16        47.    As a direct result, Defendants have profited enormously from this illegal

17   practice, all the while being able to maintain plausible deniability.

18                   **CLASS ALLEGATIONS**

19        48.    Plaintiff brings this action, pursuant to Code of Civil Procedure § 382 on

20   behalf of herself and a class, defined as follows:

21           A.   The "Class:" A class consisting of all wireless telephone subscribers in the

22   nation who were charged by VeriSign, m-Qube, and/or Blinko for mobile content services

23   where the date of authorization for such charges preceded the date that the telephone number

24   was assigned to such subscriber by his or her wireless carrier; provided, however, that the

25   following are excluded from this proposed Class: (i) the defendants, and (ii) any employee of

26   defendants.

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1       49.     The Class consists of thousands of individuals and other entities, making

2   joinder impractical, in satisfaction of Code of Civil Procedure § 382.

3       50.     The claims of Plaintiff are typical of the claims of all of the other members of

4   the Class.

5       51.     Plaintiff will fairly and adequately represent and protect the interests of the

6   other members of the class. Plaintiff has retained counsel with substantial experience in

7   prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to

8   vigorously prosecuting this action on behalf of the members of the class, and have the

9   financial resources to do so. Neither Plaintiff nor her counsel has any interest adverse to

10   those of the other members of the Class.

11       52.     Absent a class action, most members of the Class would find the cost of

12   litigating their claims to be prohibitive, and will have no effective remedy. The class

13   treatment of common questions of law and fact is also superior to multiple individual actions

14   or piecemeal litigation in that it conserves the resources of the courts and the litigants, and

15   promotes consistency and efficiency of adjudication.

16       53.     Defendants have acted and failed to act on grounds generally applicable to the

17   Plaintiff and the other members of the respective class, requiring the Court's imposition of

18   uniform relief to ensure compatible standards of conduct toward the members of the Class.

19       54.     The factual and legal bases of Defendants' liability to Plaintiff and to the other

20   members of the Class are the same, resulting in injury to the Plaintiff and to all of the other

21   members of the Class. Plaintiff and the other Class members have all suffered harm and

22   damages as a result of Defendants' unlawful and wrongful conduct.

23       55.     There are many questions of law and fact common to the claims of Plaintiff

24   and the other members of the Class, and those questions predominate over any questions that

25   may affect individual members of the Class. Common questions for the Class include but are

26   not limited to the following:

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(a)     Whether Defendants have unjustly received money belonging to Plaintiff and the Class and whether under principles of equity and good conscience, they should not be permitted to retain it;

(b)     Whether Defendants tortiously interfered with Plaintiff's and the Class's contracts with their wireless carriers by causing them to be charged for products and services by their carrier that were authorized by the prior owner of their telephone number.

(c)     Whether Defendants' conduct described herein violates California Business and Professions Code sections 17200, *et seq.*

## FIRST CAUSE OF ACTION

### (Restitution/Unjust Enrichment on behalf of the Class)

56.     Plaintiff incorporates by reference the foregoing allegations.

57.     A benefit has been conferred upon Defendants by Plaintiff and the Class. Defendants have received and retain money belonging to Plaintiff and the Class resulting from their causing to billed and collected unauthorized third party mobile content charges, and in particular, their practice of systematically, repeatedly and without authorization, causing Plaintiff and the Class of cellular telephone customers to be billed by their cellular carriers for mobile content services authorized to be purchased by the previous subscriber assigned such telephone numbers.

58.     Defendants appreciate or have knowledge of said benefit.

59.     Under principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiff and the Class which Defendants have unjustly received as a result of their actions.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

13

1

## SECOND CAUSE OF ACTION

2

**(Tortious Interference with a Contract on behalf of the Class)**

3    60.    Plaintiff incorporates by reference the foregoing allegations.

4    61.    Plaintiff and the Class had contractual relationships with their wireless carriers

5    whereby they agreed to pay a certain sum of money in exchange for activation of their

6    cellular telephone accounts and their carriers' promise to provide various communication and

7    related services to Plaintiff and the Class and to bill Plaintiff and the Class only for products

8    or services the purchase of which they had authorized.

9    62.    Defendants knew of these contractual relationships and intended to and did

10   induce a breach or disruption of the contractual relationships.

11   63.    Defendants intentionally interfered with said contractual relationships through

12   improper motives and/or means by knowingly and/or recklessly repeatedly causing

13   unauthorized charges to be placed on the cellular telephone bills of cellular telephone owners

14   across the nation.

15   64.    Plaintiff and the Class have suffered loss as a direct result of Defendants'

16   conduct.

17

## THIRD CAUSE OF ACTION

18

**(Unlawful, Unfair and Deceptive Business Practices in Violation of California
Business & Professions Code § 17200, et seq. on behalf of the Class)**

19   65.    Plaintiff incorporates by reference the foregoing allegations.

20   66.    The Unfair Business Practices Act proscribes unfair business competition and

21   defines same to include any "unfair," "unlawful," or "fraudulent" business act or practice.

22   California Business & Professions Code §17200 *et seq.*

23   67.    Defendants violated, and continue to violate this proscription through their

24   conduct as set forth above.

25   68.    Defendants, through their acts of unfair competition, have obtained money

26   from Plaintiff and members of the proposed Class.  Plaintiff and the members of the Class

27

28

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
14

1   ask that this Court restore this money to them and enjoin Defendants from continuing their

2   illegal practices.

3          69.     Such conduct is ongoing and continues to this date.  Plaintiff, the Class

4   members and the general public are therefore entitled to the relief described herein.

## PRAYER FOR RELIEF

6          WHEREFORE, Plaintiff Aliza Valdez, on behalf of herself and the Class, prays for

7   the following relief:

8          a)     Certify this case as a class action on behalf of the Class defined above

9   and appoint Aliza Valdez Class Representative, and appoint Jay Edelson and John G.

10  Jacobs, as co-lead counsel;

11         b)     Declare that the actions of Defendants, as set out above, constitute

12  unjust enrichment, tortious interference with a contract, and are in violation of

13  California Business and Professions Code §17200;

14         c)     Enter judgment against Defendants for all economic, monetary,

15  actual, consequential, and compensatory damages caused by Defendant' conduct, and

16  if their conduct is proved willful, award Plaintiff and the Class exemplary damages;

17         d)     Award Plaintiff and the Class reasonable costs and attorneys' fees;

18         e)     Award Plaintiff and the Class pre- and post-judgment interest;

19         f)     Enter judgment for injunctive and/or declaratory relief as is necessary

20  to protect the interests of Plaintiff and the Class;

21         g)     Award such other and further relief as equity and justice may require.

**JURY DEMAND**

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: October 18, 2007

LAW OFFICES OF TERRY M. GORDON

By: _____

TERRY M. GORDON
One of the Attorneys for ALIZA
VALDEZ, individually and on behalf of
a class of similarly situated individuals

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF
16